IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:13-CV-_____-___-___

KEIFER JOHNSON,

      Plaintiff,

      vs.

WESTERN STATE COLORADO UNIVERSITY,
BRAD BACA, in his official capacity as president of
        Western State Colorado University,
GARY PIERSON, in his official capacity as Vice
        President Student Affairs & Dean of
        Students, and
SARA PHILLIPS, individually, and in her official
        capacity as Title IX Coordinator,

      Defendants.

---

## VERIFIED COMPLAINT AND JURY DEMAND

---

      COMES NOW Plaintiff, Keifer Johnson, by and through his undersigned counsel, and complains against the Defendants as follows:

## I.      JURISDICTION

      1.      The action arises under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, and under U.S.C., Title 42, Section 1983, as hereinafter more fully appears.

      2.      The jurisdiction of the Court is predicated upon Article III of the United States Constitution and 28 U.S.C. Sections 1331 and 1343(a)(3).

## II.     STATEMENT AS TO PARTIES

3.     <u>Plaintiff</u>:  Plaintiff Keifer Johnson is an individual who is currently enrolled as a sophomore undergraduate student at Western State Colorado University, located in Gunnison, Colorado.

4.     <u>Defendants</u>:

5.     Defendant Western State Colorado University is a four-year public liberal arts college located in Gunnison, Colorado.  It is sued through its President, Brad Baca, in his official capacity, Gary Pierson, in his official capacity as Vice President Student Affairs & Dean of Students, and Sara Phillips, in her official capacity as the schools Title IX Coordinator.

6.     Defendant Brad Baca is the President of Western State Colorado University.  As President, he is the chief executive officer, has general authority and responsibility for the University, and sits at the pleasure of, is responsible to, and represents, the Board of Trustees, who govern the University.  President Baca is sued in his official capacity.

7.     Defendant Gary Pierson is the Vice President of Student Affairs and Dean of Students at Western State Colorado University and is sued in his official capacity.

8.     Defendant Sara Phillips is the Title IX Coordinator at Western State Colorado University and is sued in both her official capacity and in her individual capacity.

### III.   FACTUAL ALLEGATIONS CONCERNING THE END OF
### THE SPRING 2013 SEMESTER

9.      Keifer Johnson ("Johnson") is a 20-year-old sophomore student at Western State Colorado University ("Western State University" or "University").

10.     Johnson is a student-athlete runner, who is a member of both the University"s cross country team, and the University"s track and field team (collectively "track team").

11.     Johnson receives a partial athletic scholarship for his participation on the school"s cross country and track teams.  The scholarship is for approximately $2,500 per semester and is applied to tuition and the school meal plan.

12.     As a student, in his freshman year, Johnson was recognized by University faculty as a talented writer of prose and poetry.  Following the first semester of freshman year (fall, 2012-2013 academic year), he was asked by one of his English writing instructors to apply to be a Teacher"s Assistant ("TA") in a spring semester English 102 course.  For acting as a TA, which consisted primarily of tutoring other students, Johnson received 3 credit hours.

13.     In his role as a TA he had no authority over other students.  He did not grade the other students work, did not provide opinions to the course instructor regarding the skills or classwork of the other students, nor did he otherwise have any influence concerning the grading of other students.  Nor was he paid for working as a Teacher"s Assistant.

14.     Enrolled in the spring semester English 102 course in which Johnson was a TA, was a freshman student named Onna Gould ("Gould"), a coed.  Johnson began to tutor Gould early in the semester in the spring of 2013.

15.     Through their acquaintance in class and tutoring, Johnson and Gould became friends and socialized outside of the classroom.

16.     In mid-May, 2013, with less than two weeks remaining in the semester, Johnson and Gould entered into a sexual relationship.

17.     During the final weeks of the semester in early through mid May, 2013, Johnson and Gould had sexual relations on 5 or 6 separate occasions, with encounters typically lasting overnight.  All but one of those encounters occurred at Johnson"s dorm room.

18.     Among college students, casual sexual relationships are sometimes referred to as "hooking up", often meaning there may be a physical relationship (on one or more occasion), but there is no committed relationship, nor what would be considered traditional dating by the couple.  When Johnson and Gould began their physical relationship, it was in the nature of hooking up.  They already knew each other well and considered themselves to be friends, but did not date.

19.     When their physical relationship began in the early part of May, it was already known by Gould that she would not be returning to school at Western State University in the fall semester of 2013.

20.     By mid-May, Gould had told Johnson, and others as well, that she would not be returning to school in the fall of 2013.  She indicated that she had been placed on academic probation after the first semester of her freshman year, as she had received grades of Cs and Ds.  She stated that she knew that her grades in the spring semester would not meet the minimum academic standards required to remain in school and she anticipated that she would be suspended from the University, pursuant to its academic code.  She, in fact, did not take most of her finals and failed most, if not all, of her classes in the spring semester.

21.     Gould also evidenced her intent to not continue as a student after the spring semester by not making any attempt to obtain the required school housing for the 2013-2014 school year, nor by making an effort to enroll in specific classes, as was also required of continuing freshman students.

22.     In addition to academic difficulties, Gould had also suffered difficulties with a serious alcohol and drug abuse problem throughout her freshman year.  Gould regularly took the drug Focalin, a controlled substance similar to Ritalin and Adderall, but it is unknown whether or not she had a doctor"s prescription for the drug.  In addition to heavy alcohol use, Gould also smoked marijuana regularly.

23.     Gould"s problems with substance abuse were not concealed, and before she left school at the end of May, 2013, she and her family had begun to make plans for her to enter into intensive in-patient substance abuse treatment during the summer.

**IV.   FACTUAL ALLEGATIONS CONCERNING THE SUMMER MONTHS AND END OF RELATIONSHIP BETWEEN JOHNSON AND GOULD**

24.     In late May, 2013, following the conclusion of the spring semester, Onna Gould left school and Gunnison, moving to her mother"s home in Boulder, Colorado. Although Keifer Johnson remained in Gunnison throughout the summer, he and Gould continued to see each other on an irregular basis, with Johnson driving to Boulder when time allowed.  Meetings between Johnson and Gould were typically limited to nighttime physical encounters.

25.     At some time between mid May and the early part of June, with the assistance of her mother, Gould located and was accepted into an in-patient substance abuse treatment program located in Chicago, Illinois.  Her treatment was scheduled to begin on approximately June 10, 2013.  During the first week in the program she was not permitted to have any regular contact with friends or the outside world in general.

26.     Prior to going into the rehab program, from roughly mid-May to June 10, Johnson and Gould continued their sexual relationship.  Their encounters were heavily influenced by a book each had read called Fifty Shades of Grey.  Both Johnson and Gould were intrigued by, and discussed with each other, the book"s descriptions of dominant and submissive relationships.  During this period, Johnson and Gould sought to imitate and role play the relationships described in the book, which included the use of bondage and light sado-masochism in their sexual relationship.

27.     Fifty Shades of Grey ("Fifty Shades of Grey") is a 2011 erotic romance novel by British author E. L. James.  It was a cultural phenomenon that quickly sold over 70 million copies worldwide, setting the record as the fastest-selling paperback of all

time, surpassing even the Harry Potter series.  The book is notable for its explicitly

erotic scenes featuring the exploration of sexual practices involving bondage/discipline,

dominance/submission, and sadism/masochism.  The theme of dominance and

submission are similarly reflected by the characters" personalities and in their

interpersonal relationships.[1]

_____

[1]     The following is a partial summary of the book from Wikipedia
(http://en.wikipedia.org/wiki/Fifty_Shades_of_Grey):

Anastasia "Ana" Steele is a 21-year-old college senior attending Washington State
University Vancouver in Washington with her best friend Katherine "Kate" Kavanagh,
who writes for their student newspaper.  Due to an illness, Kate persuades Ana to take her
place and interview 27-year-old Christian Grey, an incredibly successful and wealthy
young entrepreneur.  Ana is instantly attracted to Christian, but also finds him
intimidating.  [Ana] is surprised when Christian appears at Clayton's, the largest
independent hardware store in the Portland area, where she works.  While he purchases
various items including cable ties, masking tape and rope . . . .  * * *

The next day [a photographer named] José, Kate, and Ana arrive for the photo shoot at
the hotel where Christian is staying and Christian asks Ana out for coffee.  The two talk
over coffee and Christian asks Ana if she's dating anyone, specifically José.  When Ana
replies that she isn't dating anyone, Christian begins to ask her about her family.  During
the conversation Ana learns that Christian is also single, but is not "a hearts and flowers
kind of guy".  This intrigues Ana, especially after he pulls her out of the path of an
oncoming cyclist.  However, Ana believes that she is not attractive enough for Christian,
much to the chagrin of Kate.

After finishing her exams Ana receives a package from Christian containing first edition
copies of Tess of the d'Urbervilles, which stuns her.  Later that night Ana goes out
drinking with her friends and ends up drunk dialing Christian, who informs her that he
will be coming to pick her up because of her inebriated state.  Ana goes outside to get
some fresh air, and José attempts to kiss her but is stopped by Christian's arrival.  Ana
leaves with Christian, but not before she discovers that Kate has been flirting with
Christian's brother, Elliott.  Later Ana wakes to find herself in Christian's hotel room,
where he scolds her for not taking proper care of herself.  Christian then reveals that he
would like to have sex with her.  He initially says that Ana will first have to fill out
paperwork, but later goes back on this statement after making out with her in the elevator.

Ana goes on a date with Christian where he takes her in his helicopter to his apartment. Once there, Christian insists that she sign a non-disclosure agreement forbidding her to discuss anything that they do together, which Ana agrees to sign.  He also mentions other paperwork, but first takes her to his playroom full of BDSM toys and gear.  There Christian informs her that the second contract will be one of dominance and submission and that there will be no romantic relationship, only a sexual one.  The contract even forbids Ana from touching Christian or making eye contact with him.  At this point, Christian realises that Ana is a virgin and agrees to take her virginity without making her sign the contract.  The two then have sex.

The following morning Ana and Christian once again have sex . . . .  Christian later takes Ana out to eat, and he reveals to her that he lost his virginity at fifteen to one of his mother's friends and that his previous dominant/submissive relationships failed due to incompatibility.  They plan to meet up again and Christian takes Ana home, where she discovers several job offers and admits to Kate that she and Christian have had sex.

Over the next few days Ana receives several packages from Christian.  These include . . . a more detailed version of the dominant/submissive contract.  She and Christian email each other, with Ana teasing him and refusing to honor parts of the contract, such as only eating foods from a specific list.  Ana later meets up with Christian to discuss the contract, only to grow overwhelmed by the potential BDSM arrangement and the potential of having a sexual relationship with Christian that is not romantic in nature. Because of these feelings Ana runs away from Christian and does not see him again until her college graduation, where he is a guest speaker.  During this time, Ana agrees to sign the dominant/submissive contract.

Ana and Christian once again meet up to further discuss the contract, and they go over Ana's hard and soft limits.  Ana is spanked for the first time by Christian; the experience leaves her both enticed and slightly confused.  This confusion is exacerbated by Christian's lavish gifts, and the fact that he brings her to meet his family.  The two continue with the arrangement without Ana having yet signed the contract.  After successfully landing a job with Seattle Independent Publishing, Ana further bristles under the restrictions of the non-disclosure agreement and the complex relationship with Christian.

The tension between Ana and Christian eventually comes to a head after Ana asks Christian to punish her in order to show her how extreme a BDSM relationship with him could be.  Christian fulfills Ana's request, beating her with a belt, only for Ana to realize that the two of them are incompatible.  Devastated, Ana leaves Christian and returns to the apartment she shares with Kate.

28.     The book's fan base has been described as being largely composed of married women over thirty, leading it to be described as "Mommy Porn" in popular media.  Another demographic in which it was extremely popular was teenage girls and college women.  Traditional literary criticism of the book and the writing has been near-universally negative.

29.     Soon after Johnson and Gould began their sexual relationship, in roughly mid-May, they agreed to "role-play" dominant and submissive postures in their physical relationship, which is also reflected in their written communications with one another.  Limited available communications between the two during this period[2] reflect their progression from exchanges of poetry to a game-like effort to imitate the literary characters in Fifty Shades.

30.     On May 12, at 8:07 pm, Johnson sent Gould an original 6 stanza poem entitled Libertatem.  On May 13, at 12:01 a.m., Gould sent Johnson an original poem entitled Vivacity.  Following Johnson sending another poem, Gould responded on May 14 at 5:16 am, as follows:  ""There's something provocative about fear.  It gives you a rush when every other feeling has gone numb." O. Gould."  (quotation marks and name in the original).  Over the next week Johnson and Gould exchanged several highly

---

[2]     The vast majority of communications between Gould and Johnson during this period - probably 80% to 90% - occurred by text messaging.  The messages provided here comes from two limited sources, e-mail exchanges and messages posted on Facebook pages.  It is anticipated that all of the text messages will be available via subpoena asserted to Johnson"s cell phone carrier.

sexualized poems, but also exchanged well-known poems such as The Raven, by

Edgar Allan Poe, and The Road Not Taken, by Robert Frost.

31.     On May 24, at 5:10 pm, Gould replied to an e-mail message from

Johnson, saying "It will in fact, be very pleasurable to see you Mr. Johnson."  Several

minutes later, Johnson responds as follows, "Mr. Johnson?  How official.  Surprising as

always, with you.  We'll get you addressing me, Sir, soon enough. * * * ."

32.     Over the next two days, May 25 - 26, 2013, the following exchanges took

place:

Gould (4:22 pm):       Mr. Johnson, I think I have been exceptionally good today.  Especially,
after last nights adventure.  I look forward to seeing you tonight.  Ill be at
my house at 1135.  If your coming earlier call me.

Johnson (11:07 pm):   Onna, Don't call me Mr. Johnson.  Refer to me, with respect, as Sir.  You
may think you've been exceptionally good today, however you, in fact,
have broken rules, several instances over last night and today.  For which,
I will not sway you gentle.  For which, you will be punished.  * * * The
essence of your vexed fibers intertwined within mine, Christ, I bet your
boiling.  Drenched to the bone.  Chew on that, don't shower-head.  Learn
anticipation as hedonism itself.

Gould (11:27 pm):     Sir, Considering the promises you have been making, you have had me in
a typhoon of confusion.  You need to be here, meet me in Golden.  Now.  I
need to talk to you.  As for today, I have been very good, my "incidents"
as you so kindly put it, do not reflect the want you have for me.  The
shower head treated me very well when I got home, as well as my
vibrator.  I think I need to shower again.

Johnson (May 26, 12:19 am)  Sir?  Good girl.  You do, in fact, have the capacity to adapt, to
apply.  Your misconduct, so to speak, does not reflect anything aside from
your disobedience regarding the rules, and your appropriation of
punishment.  Know this, and adapt accordingly.  I simply can't meet
tonight.  You be briefed later as to why.  However, as aforementioned, be
ready tomorrow night at 8, I'm staying over.  As far as your vibrator goes,
I'm shattering it right before I snap you in half.  Split you.  **<u>HAVE MY
BELT READY</u>**.  Now, Onna, adapt again . GO TO SLEEP.  Horizons are
only yet cresting, -Keifer  (Bold, underline and emphasis added.)

Gould (12:22 am):   You never specified the rules darling.  **YOU MIGHT NEED TO SPANK ME NOW,** cause damn this rum, and wine are good.  **PUNISH ME FOR THAT**.  The night is still young.  See you tomorrow.  (Bold, underline and emphasis added.)

Johnson (8:06 pm):   I will not see you tonight.  I can't, my coach called my parents, I failed a class.  In order to compete next year, I must enroll in Summer courses.  Needless to say, they're livid.  As a result; No Boulder.  Fortunately, I will however be running the Boulder, Boulder tomorrow.  Come out and watch, be at Folsom around 8.  8 A.M. So sleep tonight.  Be a good girl, for once, Onna.  * * *

33.    From approximately May 15, 2013, until Gould entered into the rehab program on approximately June 10, 2013, the couple engaged in consensual sexual behavior that included bondage and sado-masochism behavior.  Gould, as reflected in the noted communications, asked Johnson to strike her using his belt.  On occasions Gould asked Johnson to choke her as punishment.  The practice of erotic asphyxiation is performed in order to increase sexual pleasure through the deprivation of oxygen.

34.    On May 28, 2013, Gould and Johnson exchanged messages through Facebook, that read,

Gould (5:15 pm):    **I WANT YOU TO USE THE BELT AGAIN.**  (Bold, underline and emphasis added.)

Johnson (5:17 pm)   I know.  **THAT'LL DEPEND ON HOW GOOD YOU'VE BEEN. SINCE YOU SEEM TO DRIP EVERY DAMN TIME I USE IT, LOOKS LIKE YOU'LL GET A NEW PUNISHMENT.**  Gagging. Now, Onna, be good and GO BACK TO WORK.  (Bold, underline and emphasis added.)

Gould (5:27 pm):    Listen to comfortably numb. And, I've been bad.  Punish me.  Hard.  * * *

35.     In late June, Gould entered into the substance abuse program in Chicago. However, in about three weeks it was discovered that Gould was pregnant and discharged from the program.  Gould returned to Boulder, again residing with her mother.  Gould"s mother was generally supportive of her daughter, but insisted that she obtain an abortion.  On several occasions Gould"s mother scheduled appointments for the procedure, but Gould refused to go.

36.     Following her return from Chicago, Johnson was fully supportive of Gould and her decision not to have an abortion.  And he was equally supportive when she decided to proceed with the procedure.  After several weeks of highly erratic behavior and resistance to her mother, Gould relented and underwent an abortion in late July. Johnson escorted her to and from the procedure.  In order to do so, he forfeited his summer job at the City Market in Gunnison.

37.     Following the abortion, Gould"s substance abuse problems remained unaddressed.  Additionally, her psychological well-being was also poor and not being addressed, and their previously child-like, role-playing relationship no longer existed. As a result, in late July and after many weeks of Gould"s tumultuous behavior, and at the behest of his parents, Johnson unilaterally ended his relationship with Gould.

38.     Within just a few weeks, after Johnson refused any further communication with Gould, she and her mother began to lodge complaints with the University about Johnson"s behavior prior to the breakup.

### V.   FACTUAL ALLEGATIONS CONCERNING PROCEDURAL ACTIONS TAKEN BY THE UNIVERSITY – FIRST INVESTIGATION

39.   Upon information and belief, sometime in early or mid-August, Western State University received a complaint against Keifer Johnson for sexual harassment and/or sexual assault concerning Onna Gould.  Upon information and belief, the complaint was asserted by Angela Gould, Onna Gould"s mother.

40.   As previously noted, by August 2013, Onna Gould was no longer a student at the University, having been dis-enrolled for more than two months.

41.   Johnson"s first indirect knowledge as concerns the assertion of a complaint came with an e-mail from Professor Alina Luna, who had utilized Johnson as a teaching assistant in the previous spring semester.  Professor Luna sent Johnson a cryptic message by e-mail late in the evening of August 17, 2013, that read:

> I am emailing to inform you that, unfortunately, you will not be able to continue as a teaching assistant in ENG 102 for the Fall 2013 semester.  Should you have any questions regarding this development, I must direct you to contact Gary Pierson, our Vice President for Student Affairs in Taylor Hall 301B (gpierson@western.edu) or Chris Luekenga, our Associate Vice President for Student Affairs in Taylor Hall 301A (cluekenga@western.edu).
>
> Sincerely, Dr. Alina Luna

42.   Upon belief, by this time the University had begun its first investigation of a complaint against of Johnson lodged by Gould or her mother.  Shortly after his TA position was revoked, he was called into the office of Gary Pierson, the University"s Vice President of Student Affairs and Dean of Students.  Johnson was not provided with any

information in advance concerning the purpose of the meeting nor of the complaint itself.

43.     On August 20, 2013, Johnson appeared, as directed, and was interviewed by Pierson at his office on campus.  Pierson indicated to Johnson that the University had received a harassment complaint about him.  For roughly one hour Pierson and Johnson discussed a letter that he had written to Gould, as well as every aspect of their relationship through its end in late July.

44.     Pierson extensively questioned Johnson about the relationship details, as well as the history and nature of their sexual activities.  Johnson was forthcoming and provided detailed information concerning their relationship over the spring semester, as well as the summer months of June and July.

45.     At no time during the interview was Johnson informed of any rights he may have as concerned either the University's investigation or any criminal investigation that might have been undertaken by law enforcement authorities.[3]

46.     At no time during the investigative interview did Pierson provide to Johnson any of the following information:

a.     The complaint itself, in written form or oral summary, nor any of the expected specifics that might be alleged in such a complaint:

---

[3]     A University representative intimated that a criminal investigation may be ongoing, but the University has not otherwise divulged whether they or anyone else contacted law enforcement to file a complaint and whether they might be acting in concert with any such criminal investigation.

      i.      The acts of Johnson alleged that formed the complaint;

      ii.     The dates of any acts alleged that formed the basis of the complaint;

     iii.    The location of any act alleged that formed the basis of the complaint;

     iv.    The specific University policies that might have been violated based upon the acts alleged to have been taken by Johnson; and

     v.     The penalties that Johnson might be subject to if the University determined that he had violated the policies of the University. (as outlined in the Student Handbook) and whether they might include suspension or expulsion.

b.    The procedural rights that Johnson might have in any disciplinary proceedings that might be undertaken against him, which should have included:

      i.      The right to not participate or remain silent in the investigative and adjudicative proceedings;

      ii.     The right to be apprised of the accusations against him;

     iii.    The right to be apprised of the evidence that would be used against him;

     iv.    The right to have adequate time to prepare for any adjudicative proceeding;

     v.     The right to a reasonable continuance to prepare for any adjudicative proceeding; and

     vi.    The right to obtain independent legal counsel and have counsel present at any investigative and adjudicative proceedings.

47.    During the investigative interview with Johnson, Pierson discussed both the school"s policies concerning student conduct and the University"s enforcement of Title IX[4] policies only in broad and general terms.  Shortly after the meeting, Pierson sent an e-mail to Johnson that read:

---

[4]    "Title IX", as used throughout, refers to Title IX, Education Amendments of 1972 § 901, 20 U.S.C. § 1681, and related provisions in the Code of Federal Regulations.

Keifer:

Here is the link:  http://www.western.edu/student-life/student-affairs/policies-and-handbooks/Final.pdf, p. 51.

Here is the Title IX link on our website:  http://www.western.edu/student-life/title-ix-sexual-harassment-and-discrimination

gp

48.     Johnson contacted his parents, Kathy Johnson and Keith Johnson, following the interview and related all of the events to them.  Keith Johnson contacted Gary Pierson to gain additional information.

49.     Within a day or two after the investigative interview, Kathy Johnson had a telephone conversation with Chris Luekenga.  He indicated to her that the complaint they had received had not come directly from Onna Gould and intimated that it had been asserted by her mother but would not be more specific.

50.     On August 22, 2013, two days following the investigative interview, Keith Johnson received a return call from Pierson at 6:30 a.m. and had a conversation lasting approximately a quarter of an hour regarding the complaint, the interview, and about the background of the relationship between Onna Gould and Keifer Johnson.

51.     In the August 22, 2013, telephone conversation with Keith Johnson, Pierson informed him that, based upon the relationship Keifer had with Gould, "the entire thing is going to result in some counseling for him."

52.     Over the next several days Keifer Johnson would commit to minor violations of the University"s student code.  The first occurred on August 23, when Keifer Johnson went to enter the school cafeteria and reached into his wallet to remove his

meal card, but instead pulled out the expired meal card of Onna Gould that he had been carrying around in his wallet for several months.  He did not tender the card to the food-services worker at the cafeteria door, or otherwise attempt to gain entry using it, as it was expired and would not provide him admittance when swiped.  Further, he possessed with him his own valid meal card, which he immediately provided and did obtain entry in order to eat.  The Gould expired meal card, however, was observed by the food-services worker examining cards at the entrance and was confiscated.  This event was reported to the University by the cafeteria operator.

53.     The second event occurred on the evening of August 24, 2013, when Johnson and three other students were observed entering into a University building through a basement window.  This incident was also brought to the attention of University officials.

54.     On Monday morning, August 26, 2013, Johnson was called into speak with the coach of the track team, Michel ("Coach Michel").  She informed him that he was suspended from the track team for an undetermined amount of time, pending further consideration.

55.     Also on August 26, 2013, Johnson received the first official notification that disciplinary action would be taken against him.  Chris Luekenga, the Associate Vice President for Student Affairs sent Johnson a letter that indicated a disciplinary hearing on three potential violations of the student code would take place on August 28, 2013.

56.     The letter stated, in relevant parts,

Dear Keifer,

You have been allegedly involved in incidents which have violated the policies of Western State Colorado University. The following policy violation(s) as outlined in the Student Handbook.  The Student Handbook can be found on the WSCU website via the following link:  http://www.western.edu/student-life/student-affairs/policiesand-handbooks/Final.pdf

* * *

SECTION THREE:  General Definitions & Conditions of Misconduct
X.  Inappropriate Behavior.  1) Towards another student. 2) Towards Sodexo Staff.
XXII.  Western Identification Card.  1) Use and Possession of another students card.

Your conduct hearing is scheduled for Wednesday August 28, 2013, 10:00 a.m..  I will be your hearing officer.  This meeting will be held in Taylor 301.  This is an official student conduct hearing and your attendance is mandatory.

* * *

[A] decision on sanctions may be made, by the Hearing Officer, based on the information at the time of the hearing.  It is in your best interest to attend the scheduled meeting in order to explain the situation through your perspective.

* * *

The procedures governing this hearing, as well as your due process rights, may be found in the Student Handbook.  Please read and familiarize yourself with this information before your hearing.

Sincerely,
Chris Luekenga

57.     Johnson subsequently met one-on-one with Luekenga and discussed all three of the identified matters at length with him.  The majority of the discussion centered on his interactions and behavior with Gould, over both the spring semester and through the first two months of the summer, when they were still involved.

58.     On August 28, 2013, Luekenga issued a letter with his findings concerning the allegations of Johnson"s student misconduct ("Disciplinary Findings & Penalties Letter").  The letter states that the "disciplinary hearing [held] on August 26, 2013" in Luekenga"s office pertained to "the incidents of 1) inappropriate behavior, 2) misuse of an identification card, and 3) breaking and entering."

59.     Luekenga specifically found that Johnson had violated "the Western State Colorado University student policy as outlined in the *Student Handbook*" and assigned Johnson the sanctions of:

a.     48 hours of community service to be completed by October 11, 2013;

b.     Placement on Judicial Probation until August 25, 2014;

c.     A letter of apology be written to the director of the residence dining hall; and

d.     Participation "in counseling, with a minimum of (4) counseling sessions that will address your decision-making skills and thought processes as well as your interpersonal relationship skills.

60.     On August 27, 2013, following the adjudicative disciplinary meeting with Luekenga, but before the issuance of the Disciplinary Findings & Penalties Letter, Johnson was reinstated on the cross country team by Coach Michael.

## VI.     FACTUAL ALLEGATIONS CONCERNING PROCEDURAL ACTIONS TAKEN BY THE UNIVERSITY – FIRST INVESTIGATION

61.     Two days after receiving the Disciplinary Findings & Penalties Letter, Johnson was summoned (by e-mail / telephone) to meet with Sara Phillips, the University"s Title IX coordinator.  In both of his previous interviews with Pierson and

Luekenga, Johnson had discussed in general the substance of Title IX, including the University's obligation to investigate and prevent sexual harassment.  He had been told in one or both interviews that Sara Phillips was the University"s Title IX coordinator.  When summoned to Sara Phillips" office, based upon those prior interviews, Johnson believed he was going to sign an acknowledgment of his awareness of Title IX policies concerning student conduct and sexual harassment.

62.     When Johnson met with Phillips on September 3, 2013, however, he was informed that he was now being investigated by Phillips for a Title IX investigation for sexual harassment based on a complaint by Onna Gould.

63.     Just as with the prior interviews with Pierson and Luekenga, Johnson was not informed of any rights he may have as concerned either the University"s investigation or any criminal investigation that might have been undertaken by law enforcement authorities.  Just as with the prior interviews with Pierson and Luekenga, Johnson was not provided with any advisement or information as noted in paragraphs 45 and 46, above.

64.     The interview by Phillips was similar to the others in that it was primarily focused on his relationship and interactions with Onna Gould.  For the third time Johnson answered all of the questions posed to him.

65.     When Johnson asked Phillips why he was being investigated for a second time concerning his relationship with Onna Gould, Phillips only indicated that this second investigation was separate and based upon the authority of Title IX.

66.     Immediately following this interview, Johnson again contacted his parents and asked for their assistance to obtain information from the University regarding both the undisclosed allegations and the basis by which he could be investigated a second time upon the same nexus of facts.

67.     Kathy Johnson spoke with Phillips at approximately 1:30 p.m. that same day, September 3, 2013.  That evening, at 7:02, Kathy Johnson wrote Phillips an e-mail that specifically noted that Keifer Johnson had repeatedly been told he was being investigated for a complaint by Onna Gould and that a Disciplinary Findings & Penalties Letter had sanctioned him for that complaint.

68.     On September 5, 2013, Johnson received correspondence from University official Edward Klein, who is Title IX Deputy.  He was informed that a meeting had been scheduled for September 10, at 3:00 p.m., and was directed to meet with Klein and a second University representative at that time.  The Klein correspondence of September 5 also stated,

> The purpose of the meeting is to perform an inquiry regarding a complaint received by the University's Title IX Coordinator.  I believe you have already been in contact with the Title IX Coordinator, Sara Phillips, and are aware that I would be contacting you.
>
> The inquiry is essentially an opportunity for us to do some fact finding surrounding the complaint.  It is not a disciplinary hearing and no decisions will be made regarding any actions on the part of the University will result from this meeting.  I am aware that you have retained an attorney, and would advise you that your attorney is welcome to attend this meeting in order to provide you advice.  He/She should understand that we will be speaking to you directly and not through them.  We will be asking you questions regarding the nature of your relationship with Onna Gould as well as specific events that may have occurred between you and Ms. Gould.  Our conversation will be recorded and the information obtained will be forwarded to Ms. Phillips.

69.    With the assistance of his parents, Johnson retained legal counsel, Gregory R. Stross.  On September 9, 2013, counsel Stross directed correspondence to Western State Colorado University, addressed to its President, Brad Baca, as well as Sara Phillips, Gary Pierson, Chris Luekenga, and Ed Klein.  Noting that he had limited information available (primarily because of the University had refused to provide Johnson with basic information concerning its actions), counsel Stross observed that the University"s efforts to undertake a second investigation based upon the same facts that it knew – or reasonably should have known from its first investigation – appeared to be an improper "effort to take „a second bit at the apple"".

70.    Counsel Stross informed the University that its actions in proceeding with a second investigation and adjudicatory proceeding were contrary to the provisions of Title IX, the Office of Civil Rights "Dear Colleague Letter of April 4, 2011, the University"s own published policies, and the United States Constitution.  Additionally, Stross noted that any such effort to conduct duplicative disciplinary proceedings based upon the same nexus of facts would be offensive to the constitutional principles of double jeopardy and due process of law, even in their reduced application in school disciplinary proceedings.  Further, counsel Stross provided legal authority demonstrating that a Title IX claim cannot be maintained by a non-student, such as Onna Gould.

71.    Johnson appeared at the 3:00 p.m. on September 10, 2013, with counsel. Also presented were Ed Klein and Jessica Vogan, another University official.  At the beginning of the meeting Ed Klein handed Johnson a sheet of paper that had thirty eight

short paragraphs typewritten on the front and back of the page.  At the top, handwritten is, "Onna Gould"s complaint – received 8/29" ("Gould Written Complaint").  Klein provided no additional information concerning the statement, such as who typed it, if it was the first complaint made, if it was composed upon the school"s request following an oral complaint, etc.

72.     Johnson and counsel Stross took fifteen minutes to review the document and, when the meeting was resumed, counsel Stross, on Johnson"s behalf, noted that paragraph 32 in the Gould"s Written Complaint could be construed as an allegation of criminal sexual assault, and that, as a result, he had advised Johnson to not answer any questions or make any statements in the meeting or in the University"s effort to conduct a second disciplinary proceedings.  The meeting concluded.

73.     Counsel Stross subsequently had a number of communications with an assistance attorney general, who was acting as a representative of the University.

## VII.   WESTERN STATE UNIVERSITY STUDENT HANDBOOK, POLICIES AND STANDARDS OF CONDUCT, 2013-2014

74.     The Western State University Student Handbook, Policies and Standards of Conduct, 2013-2014 ("University Policies of Conduct"), provides,

> The Office of Community Standards is responsible for overseeing the University wide conduct system and coordinating all related processes and functions.  The Office of Community Standards is responsible for the interpretation and enforcement of the Western State Colorado University Student Conduct Code and the Residential Life Rules and Policies, which govern the rights and responsibilities related to all acts of student conduct.  The Office of Community Standards is housed in the Office of Student Affairs and is directed by the Associate Vice President for Student Affairs/Chief Conduct Officer.

> University Policies of Conduct, preamble, unnumbered page 2.

75.     The University Policies of Conduct also expressly provides,

The goals of the Office of Community Standards are . . . [t]o protect the rights of
individuals accused of violating University rules and policies and [t]o provide a
fair, supportive, and timely hearing process to address instances of alleged
violations of University rules and policies."

University Policies of Conduct, preamble, unnumbered page 3-4.

76.     The University Policies of Conduct are a labyrinthine tangle of sometimes-
contradictory and frequently constitutionally inadequate procedures that include
separate sections, each with numerous subsections, for "General Definitions And
Conditions Of Misconduct", "Judicial Response To Misconduct", "Formal Hearing
Procedures For Misconduct, Information Hearing Procedures For Misconduct", "Sexual
Harassment And Assault-Student (sic) Procedures", and "Sexual Harassment
Complaint, Investigation, And Resolution Procedures For Complaints Involving
Employees Or Third Parties".

77.     For example, with regard to the Formal Judicial Hearing Procedures for
misconduct, one section of the written policies states:

In order that a student is guaranteed due process and a fair hearing, the following
steps will be followed:

Note: Title IX Sex Discrimination cases require a specific investigative and
procedural process.  For more information regarding Title IX, please go to
SECTION SEVEN.

University Policies of Conduct, p. 72.

78.     Whatever notice may have been due to Johnson in either disciplinary
investigation would necessarily have begun with providing him notice of the provision
under which any investigation may be proceeding.  As noted, any complaint filed by

Gould was asserted several months after she ceased being a student at the University. Gould lacked standing to assert a Title IX claim against the University for any alleged harassment occurring subsequent to her disenrollment.  Any complaint Gould asserted concerning activities while she was a student have been fully adjudicated.

79.    The University"s actions against Johnson are replete with failures to afford him the minimally required due process protections in any disciplinary action.  The University"s actions contravene its own code of conduct.  The University"s actions are contrary to double jeopardy protections under the Fifth Amendment to the United States Constitution.

### VIII.    FIRST CLAIM FOR RELIEF – 42 USC §1983
Denial Of Procedural Due Process, United States Constitution
Obligation To Conduct Fair Disciplinary
Investigations and Proceedings
(All Defendants)

80.    The allegations of paragraphs 1 through 79 are incorporated herein by reference.

81.    The University and its representatives violated Johnson"s due process rights by proceeding to conduct a second disciplinary investigation without having properly apprised him in the first disciplinary proceeding of the acts alleged that formed the complaint against him, the dates of any acts alleged that formed the basis of the complaint against him, the location of any act alleged that formed the basis of the complaint against him, the University policies that might have been violated based upon the acts alleged to have been taken by him, and by failing to advise him in advance of the potential penalties that he might be subject to if the University determined that he

had violated the policies of the University, and specifically whether they might include suspension or expulsion.

82.     The University and its representatives have violated and continue to violate Johnson"s due process rights in the second disciplinary investigation by failing to properly apprise him of the acts alleged that formed the complaint against him, the dates of any acts alleged that formed the basis of the complaint against him, the location of any act alleged that formed the basis of the complaint against him, the policies that might have been violated based upon the acts alleged to have been taken by him, and by not advising him in advance of the penalties that he might be subject to if it is determined that he violated the policies of the University or Title IX, and whether they might include suspension or expulsion.

83.     The University and its representatives have and continue to violate Johnson"s due process rights by failing to apprise him of his legal due process rights in the second disciplinary investigation, including, but not limited to, the right to not participate or remain silent in the investigative and adjudicative proceedings; the right to be apprised of the accusations against him; the right to be apprised of the evidence that would be used against him; the right to have adequate time to prepare for any adjudicative proceeding; and the right to a reasonable continuance in order to prepare for any adjudicative proceeding.

84.     The Defendants have performed the noted acts under color of law, depriving Plaintiff due process of law, a right and privilege secured by the Fifth and Fourteenth Amendments to the United States Constitution.

85.     As a result of the Defendants" actions, Plaintiff has suffered actual damages which include continuing violations and deprivation his constitutional rights, continuing threat of depravation of his education, emotional distress, embarrassment, humiliation, and loss of reputation.

## IX.     SECOND CLAIM FOR RELIEF – 42 USC §1983
### Double Jeopardy, United States Constitution
### (All Defendants)

86.     The allegations of paragraphs 1 through 85 are incorporated herein by reference.

87.     The University and its representatives have violated and continue to violate Johnson"s right to be free from being placed in double jeopardy, by conducting a second disciplinary investigation and proceeding against him based upon the same nexus of facts that the University knew, or reasonably should have known existed, and which formed the basis of a prior disciplinary adjudication against the Plaintiff.

88.     The Defendants have performed the illegal actions under color of law, depriving Plaintiff his right to be free from being placed in double jeopardy, a right and privilege secured by the Fifth and Fourteenth Amendments to the United States Constitution.

89.     As a result of the defendants" actions, Plaintiff has suffered actual damages which include continuing violations and deprivation his constitutional rights, continuing threat of depravation of his education, emotional distress, embarrassment, humiliation, and loss of reputation.

## X.     THIRD CLAIM FOR RELIEF – 42 USC §1983
Denial Of Procedural Due Process - Failure to Train and Supervise
(Defendants Western State Colorado University and President Baca)

90.    The allegations of paragraphs 1 through 89 are incorporated herein by reference.

91.    The University and President Baca have failed to properly instruct, train, supervise, and control the University administrators and staff in the performance of their duties as concern administration of disciplinary procedures and enforcement of Title IX.

92.    When failing to properly instruct, train, supervise, and control the University administrators and staff, the University and President Baca had actual or constructive knowledge that the University administrators and staff were engaged in conduct that posed a persuasive and unreasonable risk of constitutional injury to citizens and students like the Plaintiff.

93.    The failures of the University and President Baca to properly instruct, train, supervise, and control the University administrators and staff and control was, at a minimum, negligent, if not deliberately indifferent to, or a tacit authorization of, the alleged offensive practices.

94.    There was an affirmative causal link between the University and President Baca"s failures to the particular constitutional injuries suffered by the Plaintiff.

95.    As a result of the University and President Baca"s failures, Plaintiff has suffered actual damages which include continuing violations and deprivation his constitutional rights, continuing threat of depravation of his education, emotional distress, embarrassment, humiliation and loss of reputation.

## XI.    FOURTH CLAIM FOR RELIEF – 42 USC §1983
### Denial Of Procedural Due Process - Negligence
(Defendants Western State Colorado University and
Sara Phillips in Her Official Capacity and Individually)

96.    The allegations of paragraphs 1 through 95 are incorporated herein by reference.

97.    Defendant Sara Phillips, as the Title IX Coordinator, owed Plaintiff a duty to exercise that degree of care, skill, diligence, and foresight that a reasonable Title IX Coordinator would be expected to exercise in similar situations.

98.    Phillips deviated from the standard of care required and was negligent in her actions and in performing her duties, including being negligent in her oversight Title IX complaints.

99.    Phillips deviated from the standard of care required and was negligent in her treatment of the Plaintiff.

100.    As a proximate result of Defendant Phillips negligence, Plaintiff has suffered, and continues to suffer, actual damages which include continuing violations and deprivation his constitutional rights, continuing threat of depravation of his education, emotional distress, embarrassment, humiliation, loss of reputation, and economic damages.

## XII.   FIFTH CLAIM FOR RELIEF – BREACH OF CONTRACT
Breach of Express Terms
(All Defendants)

101.   The allegations of paragraphs 1 through 100 are incorporated herein by reference.

102.   The University entered into one or more contracts with the Plaintiff.

103.   The terms of such contracts with the Plaintiff are founded upon the written policies of the University, primarily expressed in the Western State University Student Handbook, Policies and Standards of Conduct, 2013-2014.

104.   The University Policies of Conduct provide for fundamental fairness in all its investigation actions and disciplinary procedures with students.

105.   The treatment and actions of the University in its first investigation, and in bringing a second disciplinary investigation, against the Plaintiff contravenes University Policies of Conduct.

106.   The University has breached its contract with Johnson.

107.   As a result of the Defendants" actions and breach of contract, Plaintiff has suffered actual damages which include continuing violations and deprivation his constitutional rights, continuing threat of depravation of his education, emotional distress, embarrassment, humiliation and loss of reputation.

### XIII.   SIXTH CLAIM FOR RELIEF – BREACH OF CONTRACT
Implied Covenant Of Good Faith And Fair Dealing
(Defendant Western State Colorado University)

108.   The allegations of paragraphs 1 through 107 are incorporated herein by reference.

109.   The University entered into one or more contracts, express or implied, with Johnson.

110.   With every express or implied contract in the State of Colorado is an implied term of good faith and fair dealing.

111.   The treatment and actions of the University towards Plaintiff in its investigations and disciplinary processes have violated the implied term of good faith and fair dealing.

112.   The University has breached one or more express or implied contract with Johnson.

113.   Plaintiff has suffered damages as a direct and proximate result of the Defendants" actions and breach of contract.  Plaintiff has suffered actual damages which include continuing violations and deprivation his constitutional rights, continuing threat of depravation of his education, emotional distress, embarrassment, humiliation and loss of reputation.

### XIV.   PRAYER FOR RELIEF

WHEREFORE, plaintiff demands on his behalf and on behalf of all class members the following relief against all defendants jointly and severally:

a.   Declaratory judgment declaring defendants' actions as unconstitutional;

b.   Injunctive relief preventing defendants from continuing such policies

contrary to the laws of the United States;

c.   Money damages to be proven at trial;

d.   Judgment for attorneys' fees pursuant to 42 U.S.C. §1988 and costs and

disbursements as provided by law, and;

e.   Such other and further relief as this court may deem just, proper,

equitable, and appropriate.

## XV.   JURY DEMAND

Plaintiff demands that all claims so triable be tried to a jury of six.

## VERIFICATION OF PLAINTIFF KEIFER JOHNSON

I, Keifer Johnson, affirm under penalty of perjury that the foregoing facts are true

to the best of my knowledge and information.

_____        10/8/13
KEIFER JOHNSON - PLAINTIFF              Date

STATE OF COLORADO        )
                         )  ss.
COUNTY OF GUNNISON       )

Subscribed and sworn to before me
on this ___8___ day of October, 2013

MELISSA CURTIS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20104014254
MY COMMISSION EXPIRES APRIL 27, 2014

Notary Name: Melissa Curtis
My Commission Expires: 4/27/14

DATED:          October 8, 2013
                Denver, Colorado


                          Respectfully submitted,


                   By: s/Gregory R. Stross
                       **Gregory R. Stross**
                       Donelson Stross, LLC
                       8001 Aritsa Place, Suite 400
                       Broomfield, CO  80021
                       Telephone:  303-450-1665
                       E-mail:  gstross@gmail.com

                       ATTORNEY FOR PLAINTIFF
                       KEIFER JOHNSON


                   CERTIFICATE OF SERVICE

        I hereby certify that on October 8, 2013, I sent the foregoing *Complaint And Jury Demand* to the following persons at the email addresses noted:

        Erica Weston, Esq.                 Brad Baca
        Erica.Weston@state.co.us           bbaca@western.edu

        Gary Pierson                       Chris Luekenga
        gpierson@western.edu               cluekenga@western.edu

        Sara Phillips
        sphillips@western.edu

                          s/Janice Bennett