IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 13-cv-2747-WJM-KMT

KEIFER JOHNSON,

     Plaintiff,

v.

WESTERN STATE COLORADO UNIVERSITY,
BRAD BACA, individually and in his official capacity as President of Western State
Colorado University,
GARY PIERSON, individually and in his official capacity as Vice President Student
Affairs & Dean of Students, and
SARA PHILLIPS, individually and in her official capacity as Title IX Coordinator,
CHRIS LUEKENGA, individually and in his official capacity as Associate Vice President
for Student Affairs, and
SUSAN COYKENDALL, individually and in her capacity as an employee of Western
State,

     Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

---

Plaintiff Keifer Johnson ("Plaintiff") brings this action against Western State

University and some of its employees ("Defendants") under 42 U.S.C. § 1983 and Title

IX of the Civil Rights Act of 1964, 28 U.S.C. § 1681 *et seq*. ("Title IX"), arising out of

disciplinary action taken against him for a sexual relationship he engaged in with

another student.  (ECF No. 1.)  After significant litigation early in this case, the operative

pleading is Plaintiff's Third Amended Complaint ("TAC").  (ECF No. 138.)  Before the

Court are Defendants' Motions to Dismiss ("Motions").  (ECF No. 150 & 163.)  For the

reasons set forth below, the Motions are granted in part and denied in part.

## I.  LEGAL STANDARD

The Motions are brought pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case.  Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."  *See id.*

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  When considering a Rule 12(b)(1) motion, however, the court may consider matters outside the pleadings without transforming the motion into one for summary judgment.  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's "factual allegations . . . [and] has wide discretion to allow affidavits, other

documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.*

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." In evaluating such a motion, a court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's TAC is eighty-two pages in length and contains 379 numbered paragraphs. (ECF No. 138.) In this section, the Court sets forth only those facts necessary for the Court's ruling on the pending Motions.[1] As required on a motion to

---

[1] While this case has a lengthy procedural background, including litigation of a temporary restraining order and preliminary injunction, the Court finds that these proceedings do not impact its analysis with regard to the Motions to Dismiss. As such, the Court will not discuss these earlier proceedings here.

dismiss, all facts pled in the TAC are taken as true, and are viewed in the light most favorable to Plaintiff.

Plaintiff Keifer Johnson is a student at Defendant Western State University ("Western"), a four-year public liberal arts college in Gunnison, Colorado.  (TAC ¶ 3.) The other Defendants hold various positions at Western:  Brad Baca is Western's President, Gary Pierson is the Vice President of Student Affairs and Dean of Students, Sara Phillips is the Title IX Coordinator, Chris Luekenga is the Associate Vice President for Student Affairs, and Susan Coykendall is an employee-faculty member.  (*Id*. ¶ 5.)

In May 2013, Plaintiff was a freshman student at Western on a partial athletic scholarship for cross-country and track and field.  (TAC ¶ 12.)  During the spring 2013 semester, Plaintiff served as a teaching assistant for an English course.  (*Id*. ¶ 13.) This position consisted primarily of tutoring other students, and Plaintiff received three credit hours for his work.  (*Id*. ¶ 14.)  Onna Gould was a freshman student in the class for which Plaintiff was a teaching assistant.  (*Id*. ¶ 16.)

During finals week of spring 2013, Plaintiff and Ms. Gould began a sexual relationship.  (*Id*. ¶ 17.)  They had both read and were interested in the "Fifty Shades of Grey" erotic novels, and frequently assumed dominant/submissive roles in bondage and light sado-masochism.  (*Id*.)  They also frequently exchanged poetry, both by known authors and of their own writing, and this poetry often reflected their role playing.  (*Id*. ¶ 18.)

Plaintiff's relationship with Ms. Gould continued through the summer of 2013, and they continued to exchange e-mail messages, text messages, and messages

through their Facebook accounts related to the dominant/submissive roles they assumed in their sexual encounters.  (*Id*. ¶ 21.)  On June 28, 2013, Plaintiff sent a letter to Ms. Gould ("Dear Onna Letter") which contained multiple references to sado-masochistic acts that he wished to perform on her.  (ECF No. 111-6.)  Plaintiff ended his relationship with Ms. Gould on July 27, 2013 by delivering her a letter to her home.  (TAC ¶ 29.)  For reasons unrelated to her relationship with Plaintiff, Onna Gould did not return to Western for the fall semester of 2013.  (*Id*. ¶¶ 19-20.)

In late July, Angela Gould—Onna Gould's mother—contacted Susan Coykendall, a professor at Western, and indicated that she wished to have Plaintiff expelled from Western.  (*Id*. ¶ 31.)  Ms. Coykendall volunteered to file a complaint on the Gould's behalf because she was not comfortable with a teaching assistant engaging in a relationship with a student.  (*Id*. ¶ 33.)  The Goulds exchanged a number of e-mails with Coykendall about whether to take action against Plaintiff.  (*Id*. ¶¶ 33-37.)

In mid-August 2013, Angela Gould contacted Chris Luekenga and lodged a complaint against Plaintiff.  (*Id*. ¶ 48.)  Angela Gould provided Mr. Luekenga with a copy of a letter that she had written to Plaintiff's parents (ECF No. 111-5), as well as a copy of the Dear Onna Letter.  (*Id*.)  Luekenga responded that the matter had been referred to Western's Title IX coordinator, and that an official Title IX investigation would proceed.  (*Id*. ¶ 49.)  At that point, Sarah Phillips became involved, and began communicating with the Goulds regarding their complaint against Plaintiff.  (*Id*. ¶ 52.)

On August 17, 2013, Plaintiff received an e-mail message from a professor in the English department stating that Plaintiff would not be permitted to continue as a

teaching assistant in the fall 2013 semester.  (*Id*. ¶ 64.)  This e-mail gave Plaintiff no

reason for the decision, but directed Plaintiff to contact Western's Student Affairs Office

if he had any questions about the decision.  (*Id*.)

On August 20, 2013, Plaintiff went to see Gary Pierson.  (*Id*. ¶ 65.)  Pierson

interviewed Plaintiff at length about his relationship with Onna Gould, including their

sexual relationship and whether all sexual encounters were consensual, and showed

Plaintiff a copy of the Dear Onna Letter.  (*Id*.)  Plaintiff was forthcoming with

information, and responded to all of Pierson's questions.  He informed Pierson that he

had written the Dear Onna Letter, but denied that there was any misconduct in his

relationship with Onna Gould.  (*Id*. ¶ 68.)  Pierson discussed Western's policies

concerning student conduct, primarily by directing Plaintiff to the university's website.

(*Id*. ¶ 69.)

On August 23, 2013, Plaintiff went to the university cafeteria and, in the

presence of a food service worker, removed Onna Gould's expired student identification

card from his wallet.  (*Id*. ¶ 77.)  Ms. Gould's card was confiscated and Plaintiff's

possession of the card was reported to the university.  (*Id*. ¶ 78.)  On August 24, 2013,

Plaintiff and several other classmates were caught by a resident assistant sneaking into

a university dormitory window.  (*Id*.)  This was also reported to university officials.  (*Id*.)

On August 26, 2013, Plaintiff received a letter from Chris Luekenga notifying him

of a disciplinary hearing scheduled for August 28, 2013 ("First Disciplinary Proceeding").

(*Id*. ¶ 79.)  The First Disciplinary Proceeding arose from three alleged violations of

Western's student code: (1) inappropriate behavior towards another student; (2)

inappropriate behavior towards cafeteria staff; and (3) use and possession of another student's card.  (*Id*.)  Upon receipt of the letter, Plaintiff immediately called his track coach, and was informed that he was temporarily suspended from the team, pending further consideration of the disciplinary action against him.  (*Id*. ¶ 82.)

On the same day he received the notice of the hearing, Plaintiff went to speak with Luekenga in his office.  (*Id*. ¶ 83.)  Luekenga explained that the university had received a complaint from an outside party related to Plaintiff's relationship with Onna Gould.  (*Id*.)  As he had with Pierson, Plaintiff was forthcoming about the nature of their relationship, and denied all misconduct.  (*Id*.)  This meeting replaced the disciplinary hearing scheduled for August 28, 2013.  (*Id*. ¶ 86.)

On August 28, 2013, Luekenga issued a letter with his findings for the First Disciplinary Proceeding.  (*Id*.)  The letter stated that the First Disciplinary Proceeding related to incidents of "1) inappropriate behavior, 2) misuse of an identification card, and 3) breaking and entering".  (*Id*.)  Plaintiff was sanctioned with 48 hours of community service, was directed to write a letter of apology to the cafeteria staff, had to attend four counseling sessions, and was placed on probation for one year.  (*Id*.)

On August 30, 2013, Plaintiff received a letter from Sarah Phillips, Western's Title IX coordinator, informing him that the university had learned of alleged sexual misconduct by Plaintiff and directing him to meet with Ms. Phillips on September 3, 2013 to discuss the complaint, as well as the university's investigation process ("Second Disciplinary Proceeding").  (*Id*. ¶ 87.)  At the September 3, 2013 meeting, Plaintiff was informed that the university had received a new complaint which was not

related to the First Disciplinary Proceeding, and that it was being investigated under Title IX.  (*Id*. ¶ 88.)  As he had with Pierson and Luekenga, Plaintiff responded to Phillips's questions and was forthcoming about the nature of his relationship with Onna Gould.  (*Id*. ¶ 89.)

On September 5, 2013, Plaintiff received a letter from Edward Klein, a Title IX deputy, asking Plaintiff to meet with him on September 10, 2013 so that Klein could "do some fact finding surrounding the complaint."  (*Id*. ¶ 106.)  Plaintiff attended that meeting with his attorney and was provided, for the first time, with an unsigned, two-page, typed list of events that was allegedly received by the university from Onna Gould on August 29, 2013.  (*Id*. ¶ 94.)  Western informed Plaintiff that Onna Gould's complaint included allegations that constituted rape or sexual assault.  (*Id*. ¶ 98.)  On the advice of counsel, Plaintiff declined to answer any questions or make any comments.  (*Id*. ¶ 108.)

A hearing on the allegations in the Second Disciplinary Proceeding was held on December 10-11, 2013.  (*Id*. ¶ 112.)  The hearing was moderated by Luekenga, and prosecuted on behalf of Western by Phillips and Pierson.  (*Id*. ¶¶ 112, 114.)  Neither Angela Gould nor Onna Gould was present at the hearing, and the only evidence presented by the university was the unsigned, two-page list of events which was allegedly lodged by Onna Gould.  (*Id*. ¶ 111.)  The disciplinary board found in favor of Plaintiff, but no rationale was ever provided.  (*Id*. ¶ 117.)  Plaintiff received no additional sanctions as a result of the Second Disciplinary Proceeding.

## III.  ANALYSIS

On these facts, Plaintiff's TAC brings twelve claims which can be placed into four

8

categories:  (1) four claims alleging different theories of gender discrimination in violation of Title IX (Claims 1-4); (2) a § 1983 claim related to the First Disciplinary Proceeding and alleging violation of Plaintiff's First Amendment rights (Claim 5); (3) four § 1983 claims alleging that the Second Disciplinary Proceeding violated Plaintiff's procedural due process rights (Claims 6-9); and (4) three state law claims (Claims 10-12).  (ECF No. 138.)  Defendants move to dismiss each of these claims, which will be discussed in turn below.

## A.    Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ."  20 U.S.C. § 1681.   Title IX is enforceable through an implied private right of action for monetary damages as well as injunctive relief.  *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

"Title IX was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities."  *Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994).  Because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the case law interpreting Title VII.  *Gossett v. Okla. ex rel. Bd. of Regents*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.").

There are multiple tests for determining whether a plaintiff has stated a discrimination claim under Title IX.  *See Yusuf*, 35 F.3d at 714.  In this case, Plaintiff argues that he has stated a claim under the erroneous outcome standard and the selective enforcement standard.  (ECF No. 157 at 7-8.)  While some of the elements of the claims are different under these theories, both require that a Plaintiff show that gender bias was a source of the deprivation.  *See Yusuf*, 35 F.3d at 715.

Defendants move to dismiss all four of Plaintiff's Title IX claims on the grounds that he has not pled sufficient facts to show that either the First or Second Disciplinary Proceeding resulted from any gender bias.  (ECF No. 150 at 9, 12.)  With regard to the First Disciplinary Proceeding, Plaintiff alleges that he has shown gender bias based on the fact that Onna Gould acted in a similar manner to him, but was not disciplined by Western.  (ECF No. 157 at 157 at 7-8.)  Specifically, Plaintiff contends that his exchange of sexually graphic letters with Ms. Gould was mutual, and the fact that he was disciplined for the language used in his letter to her, but that she faced no discipline for the letters she wrote to him, shows that the First Disciplinary Proceeding was motivated by a gender bias.  (*Id.*)

A plaintiff may meet his *prima facie* burden of creating an inference of gender discrimination by stating facts showing that he was treated differently than someone of the opposite gender who was similarly situated to him.  *See Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996); *Chytka v. Wright Tree Serv.*, 925 F. Supp. 2d 1147, 1164 (D. Colo. 2013).  However, the plaintiff and his comparator must be similarly situated "in all material respects."  *Martinez v. Northern Rio Arriba Elec.*

*Coop.*, 139 F.3d 912 (10th Cir. 1998).

Given the allegations in the TAC, the Court finds that Plaintiff and Onna Gould were not similarly situated in all material respects.  At the time of the First Disciplinary Proceeding, Plaintiff was a student at Western while Onna Gould was not.  (TAC ¶¶ 20, 281.)  Plaintiff fails to show how Western could have taken disciplinary action against a former student who was no longer enrolled at the university.  More significantly, the allegations in the TAC show that Plaintiff and Ms. Gould were not in the same position with regard to their relationship to Western.  At the time their sexual relationship began, Plaintiff was a teaching assistant in the English Department, while Onna Gould was one of his students.  (TAC ¶¶ 13, 16-17.)  Though Plaintiff alleges that he had no authority over Ms. Gould by way of his position as her teaching assistant, he admits that he tutored other students, received academic credit, and was "effectively a University employee and an insured under the University's general liability insurance."  (*Id*. ¶ 15.) There is no allegation that Ms. Gould was a teaching assistant or had any similar supervisory relationship with other students at Western.

Given their disparate relationships to the university, the Court finds that Plaintiff was not similarly situated to Onna Gould in all material respects.  *See Goenaga v. Milmar Food Grp., Inc.*, 2012 WL 5177503, *6 (S.D.N.Y. Oct. 12, 2012) (supervisors cannot be similarly situated to supervisees); *Papritz v. U.S. Dep't of Justice*, 1987 WL 10877, *2 (D.D.C. May 1, 1987) (same); *see also Russell v. Nat'l Amusements, Inc.*, 2009 WL 262494, *14 (N.D. Ohio Feb. 4, 2009) (inappropriate behavior by supervisor towards supervisee is not similar to a supervisee acting inappropriately to his

supervisor).  As such, the Court finds that Plaintiff being subjected to the First Disciplinary Proceeding while Onna Gould was not disciplined does not give rise to an inference of gender bias in this case.

With respect to both proceedings, Plaintiff argues that gender bias is apparent from the fact that a "conspiratorial effort of a group of females (Goulds, Boykendall, Phillips, Shelley Reed, and Alina Luna) . . . worked jointly to bring about a Title IX disciplinary action against Plaintiff."  (ECF No. 157 at 8.)  In the TAC, Plaintiff points out that 83% of Western's English Department were female.  (TAC ¶ 39.)  From this, Plaintiff appears to argue that he can raise an inference of gender bias simply by alleging that the disciplinary action was taken by a group of individuals of the opposite sex.

First, this argument is not factually supported by the allegations in the TAC. Plaintiff alleges that the decision to initiate the First Disciplinary Proceeding was made by Defendants Phillips, Pierson, and Luekenga—two of whom are males—and that Luekenga and Pierson are the individuals who repeatedly interviewed Plaintiff as part of the investigation.  (TAC ¶¶ 58, 65-68.)  Although the Second Disciplinary Proceeding was allegedly brought by Ms. Phillips in her capacity as Title IX coordinator, Plaintiff alleges that Pierson and Luekenga were involved in the investigation, and that Edward Klein, Western's Title IX Deputy, communicated with and interviewed Plaintiff as part of the university's investigation.  (*Id*. ¶¶ 106-07.)  Finally, Plaintiff alleges that the two day hearing conducted on the Second Disciplinary Proceeding was conducted a panel that included both male and female members, and was moderated by Mr. Luekenga.  (*Id*. ¶¶ 112, 114.)  Taking these allegations as true, as the Court must, they do not support

Plaintiff's argument that the disciplinary proceedings were the result of a conspiracy among a group of women.

Additionally, Plaintiff cites no case law supporting his position that disciplinary action taken by members of the opposite sex gives rise to an inference of gender-based discrimination.  Title IX protects students from gender discrimination by members of either sex.  *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65-66 (1st Cir. 2002) (recognizing a cause of action for same-sex discrimination under Title IX).  However, just as one cannot presume that a supervisor's actions are free of gender bias if he is the same sex as the plaintiff, the fact that the individual taking diciplinary action against the plaintiff belongs to the opposite gender does not, of itself, give rise to an inference of gender bias.  Rather, regardless of the gender of the person imposing discipline, the crucial point is that a plaintiff must show that the discipline occurred "because . . . of sex".  *Id*. (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). The fact that Plaintiff's complainant, Ms. Gould, is a female, as are the parent, faculty member, and some of the administrative staff who assisted her, does not raise an inference that they conspired against Plaintiff to have him disciplined because of his gender.

"A plaintiff alleging racial or gender discrimination by a university must do more than recite conclusory assertions.  In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of . . . discriminatory intent."  *Yusuf*, 35 F.3d at 713.  As set forth above, Plaintiff has not met his burden of pleading sufficient facts to show that Western's disciplinary proceedings were the result of

gender bias.  Because gender bias is a required element of a Title IX claim, this

pleading deficiency is fatal to all of Plaintiff's Title IX claims.  *See Wolfe v. Fayetteville,*

*Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011) (a showing of gender bias is a

necessary element of a Title IX claim).

Accordingly, Defendants' Motions to Dismiss are granted to the extent they seek

dismissal of all claims brought under Title IX, and such claims are dismissed.

**B.    Section 1983 Claims**

Plaintiff brings five claims pursuant to 42 U.S.C. § 1983, four involving an alleged

violation of Due Process rights, and one alleging a First Amendment free speech

violation.  Defendants move to dismiss all claims, arguing: (1) Plaintiff has failed to

allege sufficient facts to state a claim; (2) any claim brought against Defendants in their

official capacity is barred by Eleventh Amendment immunity; and (3) any claim brought

against Defendants in their individual capacities is barred by qualified immunity.  (ECF

Nos. 150 at 18-28; 163 at 8-12.)  The Court will address these arguments in turn below.

1.    Sufficiency of Pleading—Due Process Claims

In Claims Six, Seven, Eight, and Nine, Plaintiff alleges that various aspects of the

Second Disciplinary Proceeding violated his Due Process rights under the Fourteenth

Amendment.  (TAC ¶¶ 295-348.)  In Claim Seven, Plaintiff alleges that he was not

adequately informed of the basis of the complaint against him, that he was not

sufficiently apprised of his rights, and that he was denied various procedural

requirements.  (*Id*. ¶¶ 317-18.)  In Claims Eight and Nine, Plaintiff alleges that he was

inappropriately subjected to multiple disciplinary proceedings involving the same subject

or related to the same events, and that he was denied counsel during those proceedings.  (*Id*. ¶¶ 325-48.)  Finally, in Claim Six, Plaintiff alleges that Western inadequately trained and supervised its Title IX coordinators.  (*Id*. ¶¶ 295-315.)

The Due Process Clause states, "No state shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. Amend. XIV, § 1.  To allege a violation of procedural due process, a plaintiff must first establish a deprivation of an interest in life, liberty, or property.  *See Elliot v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012).  Defendants contend that, because the Second Disciplinary Proceeding resulted in a finding in Plaintiff's favor, he cannot show that he was deprived of any liberty interest.  (ECF No. 150 at 20.)

In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court held that public school students had a right to public education, and that any deprivation of that education which was "not *de minimis*" required some form of due process.  *Id*. at 576 (holding that a 10-day suspension was not *de minimis*).  However, Plaintiff here has not alleged that he was suspended or expelled from Western.  Rather, Plaintiff alleges that he was deprived of a protected liberty or property interest when he was not allowed to continue as a teaching assistant, was temporarily suspended from the track team, had his right to an education free of gender discrimination violated, and was humiliated and suffered damage to his reputation.  (ECF No. 157 at 18-19.)  As set forth below, none of these interests are sufficient to meet Plaintiff's burden of showing that he was deprived of a protected property or liberty interest.

The Tenth Circuit has held that a student has no protected property interest in

participating in any specific school-sponsored activity.  *Albach v. Odle*, 531 F.2d 983,

985 (10th Cir. 1976) (no property interest in continuing a certain school-sponsored

activity); *Seamons v. Snow*, 84 F.3d 1226, 1235 (10th Cir. 1996) (no protected interest

in participating in sports).  Plaintiff has articulated no theory under which his

participation on the track team implicates a liberty interest.  Thus, Plaintiff's temporary

suspension from the track team does not implicate a protected interest.

Although Plaintiff received academic credit to serve as a teaching assistant,

which makes that distinguishable from a purely extracurricular activity, the Tenth Circuit

has held that a student does not have a protected right to a particular curriculum.  *See*

*Seamons*, 84 F.3d at 1235 (student does not have a right to take advanced placement

classes).  Even more factually on point, other courts have held that a student has no

protected interest in continuing as a teaching assistant.  *See Naragon v. Wharton*, 572

F. Supp. 1117, 1123 (M.D. La. 1983).  Plaintiff cites no contrary authority.  As such,

Plaintiff's exclusion from the teaching assistant program did not deprive him a protected

interest.

The Court has already held that Plaintiff has failed to state a claim under Title IX

for gender discrimination.  Accordingly, Plaintiff has likewise failed to allege that he was

deprived of an education free from such discrimination.  Finally, harm to one's

reputation and humiliation are not sufficient to show that a plaintiff was deprived of a

liberty or property interest.  *Seasons*, 84 F.3d at 1235 ("damage to an individual's

reputation alone, apart from some more tangible interest, is not enough to establish a

due process violation") (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

As Plaintiff has not alleged sufficient facts showing that the Second Disciplinary Proceeding deprived him of any protected liberty or property interest, he has failed to state a claim for a violation of his procedural due process rights. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (stating that the first step in a procedural due process claim is examining "whether there exists a liberty or property interest which has been interfered with by the State"). Accordingly, Defendants' Motions to Dismiss are granted as to Claims Six, Seven, Eight, and Nine.[2]

2.  First Amendment

In Claim Five, Plaintiff alleges that the First Disciplinary Proceeding violated his First Amendment right to free speech, as he was punished for the Dear Onna Letter. (TAC ¶¶ 281-85.) Claim Five is brought against Defendants Baca, Pierson, Phillips, Luekenga, and Coykendall in their official capacities only, and seeks compensatory damages, a declaration that the First Disciplinary Proceeding violated the First Amendment, and injunctive relief in the form of expungement of the First Disciplinary Proceeding from Plaintiff's official student file. (*Id*. ¶¶ 292-94.)

Defendants contend that Plaintiff has failed to allege sufficient facts to state a claim for a First Amendment violation. (ECF No. 150 at 26.) To state a claim for a violation of the First Amendment right to free speech, a plaintiff must allege that he engaged in constitutionally protected activity, that the defendant's actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing

---

[2] Because the Court has found that Plaintiff has failed to state a claim, it need not address Defendants' alternate arguments regarding Eleventh Amendment immunity and qualified immunity as to the Due Process claims.

to engage in that activity, and that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).  Defendants do not challenge the second prong, but argue that Plaintiff has not alleged that he engaged in protected speech, or that the First Disciplinary Proceeding was motivated as a response to protected speech.  (ECF No. 150 at 26-27.)

With regard to the first prong—whether the speech at issue was protected— Defendants contend that Plaintiff's factual allegations fall short because the Dear Onna Letter was "sexually graphic with elements of violence."  (ECF No. 150 at 27 (citing TAC ¶ 223).)  While the First Amendment generally protects an individual's right to free speech, a number of different types of speech are not protected.  *See, e.g., Virginia v. Black*, 538 U.S. 343 (2003) (holding that the First Amendment's protections do not extend to speech that constitutes a "true threat"); *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516 (2002) (false statements of fact are not protected speech); *Miller v. California*, 413 U.S. 15 (1973) (obscenity is not protected by the First Amendment).  Defendants do not specifically identify which category of unprotected speech within which they contend the Dear Onna Letter falls.  (*See* ECF No. 150 at 27-28.)  However, the cases cited by Defendants involve the "true threat" exception to the First Amendment's protections.  (*Id.*)

"True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Black*, 538 U.S. at 359-60.  A speaker

18

must have both the intent to communicate the threatening words, and the intent that the recipient of the speech "believe that the speaker intends to act violently." *United States v. Heineman*, __ F.3d __, 2014 WL 4548863 (10th Cir. Sept. 15, 2014).

Whether speech constitutes a "true threat" for purposes of determining whether the speech is protected by the First Amendment is generally a question for the jury to determine. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1167-68 (10th Cir. 2009) (the determination of whether a given communication is a true threat is "a fact-intensive inquiry, in which the language, the context in which the statements were made, as well as the recipients' responses are all relevant."). In determining whether communications constitute an unprotected true threat, they "should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." *United States v. Orozco-Santillan*, 903 F.2d 1262 1265 (9th Cir. 1990).

In this case, Plaintiff repeatedly alleges that the Dear Onna Letter was part of a mutually-agreed upon sexual fantasy relationship between himself and Onna Gould. Taking these allegations as true, as the Court must on a motion to dismiss, a reasonable juror could conclude that the contents of the Dear Onna Letter did not constitute a "true threat" and were, therefore, protected speech. Accordingly, the Court finds that Plaintiff has met his burden of pleading that his speech was protected by the First Amendment.

With regard to the motivation for the First Disciplinary Proceeding, Defendants contend that Plaintiff has alleged facts showing that it began in response to Plaintiff's behavior, rather than his speech. (*Id*. at 26.) Specifically, Defendants argue that the

First Disciplinary Proceeding related to Plaintiff's behavior toward Onna Gould.  (*Id.*)  In

the TAC, Plaintiff alleges that, as a result of the First Disciplinary Proceeding, he was

found to have engaged in "inappropriate behavior towards another student."  (TAC ¶

278.)  While this seems to support Defendants' argument, Defendants ask the Court to

ignore Plaintiff's allegation that "[t]he purported inappropriate behavior towards another

student First Disciplinary Proceeding was based upon the writing and delivery of the

Dear Onna Letter, *and the contents . . . within the letter*."  (TAC ¶ 280 (emphasis

added).)

    In evaluating a motion to dismiss, the Court must draw all reasonable inferences

in the plaintiff's favor.  A reasonable inference from the allegations in the TAC is that

Plaintiff was punished, at least in part, for the content of the Dear Onna Letter, which

constitutes speech and not behavior.  Thus, the Court finds that Plaintiff has alleged

sufficient facts to satisfy his burden of showing that the First Disciplinary Proceeding

was motivated by his protected speech.

    As Plaintiff has pled sufficient facts to satisfy each element of his First

Amendment free speech claim, the Court rejects Defendants' argument that he has

failed to state a claim.[3]  Defendants next contend that, because this claim is brought

---

[3]  The Court notes that Defendants have asserted qualified immunity against all § 1983
claims (ECF No. 150 at 18), which would ordinarily require the Court to determine whether the
constitutional violation pled by Plaintiff was clearly established at the time of Defendants'
actions.  *See Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that qualified immunity
involves a two-pronged inquiry: (1) deciding whether the facts that a plaintiff has alleged or
shown make out a violation of a constitutional right; and (2) deciding whether the right at issue
was "clearly established" at the time of the defendant's alleged misconduct.)  However, qualified
immunity is not available to claims brought against state employees in their official capacity.
*See Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1187-88 (D.N.M. 2004) (citing *Leatherman v.
Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) and *Hafer v.
Melo*, 502 U.S. 21, 24 (1991)).  Because Plaintiff's First Amendment claim is brought against

against them in their official capacities, it is barred by the Eleventh Amendment.  (ECF No. 150 at 18 n.7.)  Claims brought against state employees in their official capacities are equivalent to claims brought against the state itself.  *See McMillan v. Monroe Cnty.*, 520 U.S. 781, 785 n.2 (1997); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009).  As such, Plaintiff's First Amendment claim is essentially brought against the State of Colorado.

The State of Colorado is protected by Eleventh Amendment immunity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Meade v. Grubbs*, 841 F.2d 1512, 1525-26 (10th Cir. 1988).  "It is well established that absent an unmistakable waiver by the state of its Eleventh Amendment immunity, or an unmistakable abrogation of such immunity by Congress, the amendment provides absolute immunity from suit in federal courts for states and their agencies."  *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 588 (10th Cir. 1994).  The State of Colorado has not waived its Eleventh Amendment immunity, *see Griess v. Colo.*, 841 F.2d 1042, 1044-45 (10th Cir. 1988), and congressional enactment of 42 U.S.C. § 1983 did not abrogate Eleventh Amendment immunity, *see Quern v. Jordan*, 440 U.S. 332, 340-345 (1979).

However, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized an exception to Eleventh Amendment immunity under which a state officer

---

Defendants only in their official capacities, the Court need not consider the assertion of qualified immunity as to this claim, and need not determine whether the constitutional violation of which Plaintiff complains was clearly established at the time of Defendants' actions.

may be enjoined from "taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant." *Id*. at 159.  This exception enables federal courts "to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. at 160).  Courts have construed the *Ex parte Young* exception narrowly, with two requirements.  First, there must be an "ongoing violation of federal law".  *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995).  Second, "[i]t applies only to prospective relief" and may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past.  *Puerto Rico Aqueduct v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

Given this case law, it is clear that Plaintiff's claims for monetary damages and retrospective declaratory relief are barred by the Eleventh Amendment.  However, Plaintiff's request for injunctive relief in the form of expungement of his record falls within the *Ex parte Young* exception.  Plaintiff claims that the inclusion of the First Disciplinary Proceeding on his official academic record violates his First Amendment free speech rights on an ongoing basis, which is an ongoing violation of federal law. (TAC ¶ 287.)  With regard to the second prong, other courts have held that a request to expunge an academic record is a request for prospective relief.  *See, e.g., Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (request to expunge grade from record is subject to *Ex Parte Young* exception to Eleventh Amendment).

Accordingly, the Court finds that Plaintiff has stated a First Amendment claim for prospective injunctive relief in the form of expungement of his academic record.

Defendants' Motions to Dismiss are granted in so far as they seek dismissal of Plaintiff's request for monetary damages and declaratory relief related to the First Amendment violation, but denied in so far as they seek dismissal of Plaintiff's claim for expungement of his record.[4]

## C.    State Law Claims

In Claims Ten, Eleven, and Twelve, Plaintiff alleges that Defendants Phillips and Coykendall, in their individual capacities, engaged in malicious prosecution, civil conspiracy, and extreme and outrageous conduct.  (TAC ¶¶ 349-379.)  Both Defendants move to dismiss this claim as barred by the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24-10-101 *et seq.*  (ECF No. 150 at 28; ECF No. 163 at 12.)

Defendants contend that Plaintiff has not satisfied CGIA's notice provisions, and that such failure is fatal to all three state law claims.  (ECF No. 150 at 28.[5])  The CGIA's notice provisions are contained in Colo. Rev. Stat. § 24-10-109(1) and state:

> Any person claiming to have suffered an injury by a public entity . . . , whether or not by a willful and wanton act or omission, shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury.

---

[4]  While the denial of qualified immunity ordinarily gives rise to the ability to appeal such ruling on an interlocutory basis, *see Behrens v. Pelletier*, 516 U.S. 299, 306 (1996), the Court does not view its current ruling as one that affords Defendants this relief because qualified immunity is not available to claims brought against state employees in their official capacities.

[5]  Defendant Coykendall incorporates this argument by reference in her opening brief. (ECF No. 163 at 2 n.1.)

Colorado courts strictly construe § 24-10-109(1) and consistently hold that "[c]omplying

with the notice of claim [as set forth in section 24-10-109(1)] is a jurisdictional

prerequisite to suit." *Gallagher v. Bd. of Trs. for Univ. of N. Colo.*, 54 P.3d 386, 391

(Colo. 2002).  Furthermore, Colorado courts describe § 24-10-109(1) as a non-claim

statute, "meaning that failure to comply with the 180–day period is an absolute bar to

suit." *Id*. at 393.  "Thus, section 24-10-109(1) is 'not subject to equitable defenses such

as waiver, tolling, or estoppel;' and plaintiffs cannot use the continuing violation doctrine

to remedy an untimely filing of notice." *Aspen Orthopaedics & Sports Med., LLC v.

Aspen Valley Hosp. Dist.*, 353 F.3d 832, 839 (10th Cir. 2003) (quoting *DeForrest v. City

of Cherry Hills Vill.*, 72 P.3d 384, 386-87 (Colo. Ct. App. 2002)).

   Additionally, "a claimant must allege in his or her complaint that the claimant has

complied with the jurisdictional prerequisite of filing of a notice of claim." *Kratzer v.

Colo. Intergovernmental Risk Sharing Agency*, 18 P.3d 766, 769 (Colo. Ct. App. 2000).

"In the context of a motion to dismiss, pleading compliance with the notice provisions of

the CGIA is de facto jurisdictional." *Aspen Orthopaedics*, 353 F.3d at 839.

   In this case, the TAC states:

> This action was filed against Defendant Sara Phillips on a
> forthwith basis, seeking temporary injunctive relief.
> Subsequently a temporary restraining order was entered
> against Defendant Phillips and other defendants to preclude
> them from proceeding against the Plaintiff; that restraint was
> lifted in November, 2013.  Strict compliance of the CGIA's
> notice requirements was a legal impossibility.  Substantial
> compliance of all the notice requirements occurred with the
> filing of the action itself, when the Complaint and Jury
> Demand were served upon the Colorado Attorney General.

(TAC ¶ 350.)  The following paragraph repeats these allegations with regard to the

claims against Defendant Coykendall.  (*Id*. ¶ 351.)

In the briefing on the instant Motions, Plaintiff makes no attempt to explain why providing the notice required by the CGIA was a "legal impossibility".  (ECF No. 157 at 24-25.)  Plaintiff instead argues that Defendants had "actual notice" of the claims against them because he filed his original Complaint within 180 days.  (*Id*.)  However, Colorado courts have explicitly held that the filing and service of a complaint within the time allowed for in § 24-10-109(1) is not sufficient to satisfy CGIA's notice provisions. *Kratzer*, 18 P.3d at 769 ("We disagree with the trial court that the filing and service of the complaint itself provided sufficient notice under the [C]GIA.").

Because it is undisputed that Plaintiff did not serve a notice of claim on either Defendant Phillips or Coykendall within 180 days of the date he discovered his injury, the Court lacks subject matter jurisdiction over Plaintiff's state law claims.  Accordingly, Defendants' Motions to Dismiss are granted as to Claims Ten, Eleven, and Twelve, and such claims are dismissed without prejudice for lack of jurisdiction.

### IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants Western, Baca, Pierson, Phillips, and Luekenga's Motion to Dismiss Plaintiff's Third Amended Complaint (ECF No. 150) is GRANTED IN PART and DENIED IN PART;

2. Defendant Susan Coykendall's Motion to Dismiss Plaintiff's Third Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) (ECF No. 163) is

GRANTED IN PART and DENIED IN PART;

3.      Plaintiff's claims arising under Title IX (Claims 1-4) are DISMISSED WITH

PREJUDICE;

4.      Plaintiff's § 1983 claims alleging procedural due process violations (Claims 6-9)

are DISMISSED WITH PREJUDICE;

5.      Plaintiff's § 1983 First Amendment claim (Claim 5) is DISMISSED WITHOUT

PREJUDICE in so far as it seeks monetary damages or declaratory relief;

6.      Plaintiff's state law claims (Claims 10-12) are DISMISSED WITHOUT

PREJUDICE as barred by the CGIA;

7.      This case shall proceed only as to Plaintiff's § 1983 First Amendment claim

(Claim 5) in so far as it seeks prospective injunctive relief in the form of

expungement of the First Disciplinary Proceeding from Plaintiff's official

academic record; and

8.      Per Magistrate Judge Boyd N. Boland's May 15, 2014 Order, Plaintiff shall file a

status report within ten days of this Order.

Dated this 24th day of October, 2014.

BY THE COURT:

_____

William J. Martinez

United States District Judge